# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 21, 2010 Session

## IN RE: PAULINE M., STEPHEN M., AND RACHAEL M.

**Direct Appeal from the Juvenile Court for Greene County**
No. J21471,    Kenneth N. Bailey, Jr., Judge

---

**No. E2009-02649-COA-R3-PT - FILED NOVEMBER 10, 2010**

---

This is a termination of parental rights case. The trial court terminated both parents' rights to the children on grounds of: (1) abandonment by failure to provide a suitable home pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(ii); and (2) persistence of conditions as set out at Tenn. Code Ann. § 36-1-113(g)(3). The trial court also terminated Father's parental rights on the additional ground of abandonment by failure to support pursuant to Tenn. Code Ann. § 36-102(1)(A)(i), and Mother's parental rights on the additional ground of mental incompetence pursuant to Tenn. Code Ann. § 36-1-113(g)(8)(B). Finding clear and convincing evidence in the record to support each of these grounds, as well as clear and convincing evidence that termination of Mother's and Father's parental rights is in the best interests of the children, we affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

T. Wood Smith, Greeneville, Tennessee, for the appellant, Stephen M.

Sandra Lee Stanbery-Foster, Greeneville, Tennessee, for the appellant, Brenda M.

Robert E. Cooper, Jr., Attorney General and Reporter; and Michael E. Moore, Solicitor General; Elizabeth C. Driver, Senior Counsel, for appellee, State of Tennessee, Department of Children's Services.

## I. Background and Procedural History

Brenda M. ("Mother") and Stephen M. ("Father") are the parents of three children, Pauline M. (d.o.b. 8/29/2005), Stephen M. (d.o.b. 11/7/2006), and Rachel M. (d.o.b. 4/15/2008). On October 26, 2007, the Department of Children's Services ("DCS") responded to a call and discovered the family living in a home which was in a state of disrepair. The home had trash heaped in piles, moldy food in the kitchen, and animal feces on the floor. Instead of running water, the family used a pump to divert water from a nearby creek.

On October 30, 2007, DCS filed a petition, alleging that Pauline M. and Stephen M. were dependent and neglected due to environmental neglect.[2] Following a hearing on November 6, 2007, the Greene County Juvenile Court found probable cause to believe Pauline M. and Stephen M. were dependent and neglected and ordered them into the protective custody of DCS. The court allowed supervised visitation with Mother; Father's visitation was conditioned on his passing two drug screens.[3] The court ordered Mother and Father to undergo mental health evaluations and parenting assessments, and further ordered Father to pay $30.00 per month in child support. DCS initially placed the children with their paternal grandparents, though they were later removed and placed in foster care following the paternal step-grandfather's admission of drug use.[4]

Soon after the children's removal, DCS began working with the parents to set up necessary services. The DCS case manager assigned to the family, Nina Shepard, referred

---

[1]Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

[2]The youngest child, Rachel M., had not been born at the time of removal. She was removed from the parents two days after birth and has remained in state custody since that time.

[3]Father was arrested for possession of marijuana as he entered the courthouse for the preliminary hearing held on November 6, 2007.

[4]The two oldest children, Pauline M. and Stephen M., lived with their paternal grandparents from their removal until February 12, 2008 at which point they were placed in foster care.

the parents to Nolinchuckey Mental Health Center for marriage counseling and to the Hope Center for parenting classes. Ms. Shepard also referred the Father, who was unemployed at the time, to Vocational Rehabilitation for assistance finding employment.

On January 3, 2008, Frontier Health conducted psychological evaluations of both parents. Father was found to be in need of individual therapy to address symptoms of depression and alcohol and drug use. Additionally, Frontier Health recommended parenting education classes and family therapy to teach him age-appropriate parenting skills, and to focus on skills necessary to provide an adequate home environment for his family. Following her evaluation, Mother was found to be functioning within the borderline range of intelligence and tests indicated that she read at the second-grade level. Frontier Health recommended parenting classes that focused on hands-on learning because of Mother's limited academic skills.

DCS offered the parents assistance with rent and deposits on a suitable home. However, the house that they found to rent was also in disrepair. When Ms. Shepard visited the house to determine its suitability, she found that it had no heat, broken windows, and holes in the floors. At one point she fell through the front stairs. Ms. Shepard explained to the parents that DCS could only offer assistance with rent and deposits on a suitable home, yet they moved into the home against her advice. To help the parents get through the winter with no heat, DCS purchased heaters for them in January 2008.

Prior to the children's removal, the parents received in-home services through the HUGS program of the Greene County Health Department.[5] Through this program, nurse Tonya Bowman visited the family once or twice a month, beginning in March 2006, to ensure that the children's health needs were being met.[6] Beginning in March 2008, Options for Families in Need, LLC ("Options") worked with Mother and Father on improving domestic skills such as housekeeping, budgeting, hands-on parenting, and personal hygiene, and advised Father on seeking employment.[7] Options also conducted weekly therapeutic

_____

[5]Ms. Bowman testified that DCS had previously referred HUGS to the family based on "environmental neglect with filthy conditions" though the date of that referral was unclear from the record.

[6]Ms. Bowman testified that Pauline M. was labeled a failure to thrive baby and had feeding issues from birth. Testimony at trial indicated that Stephen M. was developmentally delayed physically and verbally although the cause of his delay is unclear from the record. Rachel M. has hip dysplasia and wears a hip brace.

[7]Options provided services from March through June, 2008, and again in October and November,
(continued...)

-3-

supervised visitations in which Mother and Father met with the children and were encouraged to implement the parenting skills that they had been taught earlier that week. During visitations, the parents' interactions with the children were observed by Options workers and DCS to evaluate their progress in implementing the parenting skills they had been taught. Later, Compass Care Alliance, LLC ("Compass Care") replaced Options and offered essentially the same services.[8]

Despite these services, the parents continued to struggle. Father, who holds an associates degree in General Studies from Walters State Community College, had difficulty keeping a job and was often unemployed or working part-time, low wage jobs.[9] Mother receives disability payments and is unable to work or drive due to her limited cognitive ability. Again in search of adequate housing, the parents moved to a local trailer park. Ms. Shepard visited the parents' new mobile home to determine its suitability and found it to be an appropriate residence. However, according to Ms. Shepard, once the parents moved into the mobile home it began "deteriorating" and having structural issues as it settled, essentially falling in on itself. Additionally, Ms. Shepard discovered roaches at this location.

During a supervised visitation in May 2008, Father had multiple visible erections while holding his newborn daughter, Rachel M. In August 2008, Pauline M., the oldest daughter, alleged that Father had touched her inappropriately. Following these incidents, Father was indicated as a sexual abuse perpetrator by DCS. On August 20, 2008, the juvenile court entered a no contact order restraining Father from any contact with his children. Father apparently did not challenge the no contact order either at that time or later. Consequently, Father moved out of the mobile home he shared with Mother and went to live with relatives. Mother subsequently moved to a different mobile home in the same neighborhood and currently resides by herself. According to Ms. Shepard, Mother's latest residence was in "much better" condition.

---

[7](...continued)
2008.

[8]Compass Care provided services from February 2009 through July 2009.

[9]Father worked at Hardees from November 2007 until February 2008. In May 2008, he worked for a short time at Taco Bell earning approximately $6.00 per hour. Following his employment at Taco Bell, Father worked as a part-time rest area attendant earning $7.65 per hour from May 10, 2008, until March 2009, when he was fired for sleeping on the job.

Parenting skills assessments were performed on each parent by Compass Care.[10] Father was found to have a high range of intelligence, but an isolated, anti-social personality. The evaluation indicated that his parenting skills would be limited and that he had not shown any appreciable improvement even after services were provided to help him. Compass Care recommended that Father secure full-time employment, receive intensive counseling focusing on his anti-social behavior, poor parenting skills, and lack of ability to cope with stress in his life, and undergo a psychosexual evaluation to determine whether he presented a risk to children.[11] Compass Care further recommended that termination should be considered if service providers had reached the maximum benefit attainable and that services should not continue indefinitely if progress was not resulting.

Mother's evaluation indicated possible cognitive impairment; deficits in parenting skills; deficits in her ability to provide a safe and nurturing environment; lack of awareness of personal hygiene standards; and a history of environmental neglect. Compass Care recommended termination because the threshold of maximum benefits had been reached and Mother's parenting skills had not increased. If services were to continue in lieu of termination, Compass Care recommended in-home training for Mother focused on parenting skills and homemaking.

All three children were adjudicated dependent and neglected by stipulation of the parties following a hearing on July 16, 2008. DCS filed a petition to terminate parental rights on March 5, 2009. As grounds, DCS averred that Mother and Father's parental rights should be terminated based upon: (1) abandonment by willfully failing to support the children; (2) abandonment by failure to provide a suitable home; (3) persistence of conditions that led to the removal of the children; and (4) mental incompetence. DCS further alleged that it was in the best interest of the children to terminate the parental rights of both Mother and Father.

A trial was held in the Greene County Juvenile Court.[12] Each parent was separately represented by appointed counsel, and a guardian ad litum was appointed to represent the children. On November 19, 2009, the trial court entered its order terminating the parental rights of both Mother and Father to all three children. The court found that both Father's and Mother's rights should be terminated on grounds of abandonment by failure to provide a

---

[10]Father's assessment was performed on June 8, 2008, and Mother's was performed on October 23, 2008.

[11]Father never underwent a psychosexual evaluation, and it does not appear from the record that he sought the recommended intensive counseling.

[12]The trial was held over six days–April 28, May 21, June 1, August 10 and 11, and September 2, 2009. DCS replaced its counsel midway through the trial.

suitable home and persistence of the conditions that led to the children's removal. The court also terminated Father's rights on grounds of abandonment by failure to support and Mother's rights on grounds of mental incompetence.[13] Further, the court held that termination of Mother's and Father's parental rights was in the best interests of the children.

## II. Issues Presented

Mother and Father filed separate notices of appeal. On appeal, Mother and Father raise the following common issues, as restated from their briefs:

> 1. Whether DCS proved by clear and convincing evidence that Mother and Father abandoned their children by failing to provide a suitable home;
>
> 2. Whether DCS proved by clear and convincing evidence that the conditions that were present when the children were removed continue to exist;
>
> 3. Whether DCS proved by clear and convincing evidence that it made reasonable efforts to provide services directed at reunifying the family;
>
> 4. Whether DCS proved by clear and convincing evidence that termination of Mother and Father's parental rights was in the best interests of the children.

Additionally, Mother raises the following issues on appeal, as stated in her brief:

> (1) [Whether DCS] prove[d] by clear and convincing evidence . . . that the mental condition of Mother is so impaired that she is mentally incompetent to adequately provide further care and supervision of the children and that it is likely to remain so that it is unlikely that she will be able to resume the care and responsibility of her children in the near future;
>
> (2) Did the trial court commit reversible error by denying the trial motion of Mother (and Father's) counsel, to dismiss the

---

[13]The trial court specifically found that abandonment by failure to support did not apply to Mother and implicitly found that mental incompetence of Father had not been proven by DCS.

State's *Petition to Terminate Parental Rights* when, at the conclusion of State's proof, the State had not produced, in support of their expert's testimony, two witnesses, referred to as "assessors," Kelle Ratliff and David Konstanopolus, who had actually prepared the Parenting Skills Assessment (of both Mother and Father) respectively, which the State's expert psychologist merely adopted, and testified, but only upon assurances of the State to the Respondents these two (2) individuals would appear for cross examination.

Additionally, Father raises the following issue on appeal, as restated from his brief:

(1) Whether DCS proved by clear and convincing evidence that Father abandoned the children by failing to provide for their support.

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such

evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tenn. R. App. P. 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See Whitaker*, 957 S.W.2d at 837; *see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

## IV. Grounds for Termination

The trial court found separate grounds for termination that applied to each parent individually, as well as grounds that applied to both parents. We will first discuss the grounds applicable to each parent individually before discussing the grounds applicable to both parents, but will, at all times, analyze the termination of Mother's and Father's parental rights separately.

### 1. Abandonment by Willful Failure to Support (Father)

The trial court found, by clear and convincing evidence, that Father's parental rights should be terminated based on abandonment by willful failure to support.[14] The court found

---

[14]Tenn Code Ann. § 36-1-113(g)(1) provides for termination of parental rights if "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred." Abandonment, in relevant part, is defined in Tenn. Code Ann. § 36-1-102(1) as:

> (A)(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s)

(continued...)

that, during the four consecutive months immediately preceding the filing of the petition, Father had "willfully failed to provide any support for the children." The court noted that Father held an associates degree, and his parenting assessment found him to be very intelligent, yet his "employment history shows employment below his apparent potential" and "what employment he did obtain was at minimum wage or slightly higher, and usually part time." Further, Father "was discharged from his last employment for cause, having been observed sleeping on the job."

We agree that the record contains clear and convincing evidence that Father abandoned his children by his willful failure to support them. In addition to the evidence found by the trial court, we note that Father was under a court order following the removal of his two oldest children, to pay $30.00 per month for their support. Toward this modest obligation, Father paid $62.29 in the four months preceding the filing of the termination petition .[15] In the year April 2008 through April 2009, Father paid a total of $152.26 in child

---

[14](...continued)
> either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;
>
> . . . .
>
> (B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;
>
> . . . .
>
> (D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child;

[15]The relevant statutory period pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i) is November 5, 2008 to March 5, 2009. Father's child support payment records were entered into evidence and are detailed below.

| Child 1 | | Child 2 | |
|---|---|---|---|
| Payment Date | Payment Amount | Payment Date | Payment Amount |
| 04/16/2008 | $6.92 | 04/16/2008 | $6.92 |
| 05/01/2008 | $6.92 | 05/01/2008 | $6.92 |
| 05/14/2008 | $6.92 | 05/14/2008 | $6.92 |
| 02/02/2009 | $16.15 | 03/02/2009 | $6.92 |
| 02/02/2009 | $13.84 | 03/16/2009 | $6.92 |
| 02/16/2009 | $16.15 | 04/01/2009 | $6.92 |
| 03/02/2009 | $9.23 | 04/13/2009 | $16.15 |

(continued...)

support, but not once did he pay the full court ordered amount of $30.00 per month. Furthermore, Father never financially supported his youngest child. Father did not sufficiently contradict this evidence at trial, merely offering that he had difficulty maintaining employment because of a medical condition. The lower court found this explanation to lack credibility as Father did not offer medical proof of his condition. Furthermore, Father's meager support of his two oldest children, and complete non-support of his newborn child, was not due to his lack of employment, as he testified to being employed as a rest-area attendant from May 2008 through March 2009. There was no evidence in the record that Father was disabled, incarcerated, or otherwise unable to support his children.

While we will not terminate the rights of a parent who fails to support a child because he or she is financially unable to do so, *In re Audrey S.*, 182 S.W.3d 838, 864 n.33 (Tenn. Ct. App. 2005), that is not the case here. Father was aware of his duty to support, was employed and capable of providing support, yet made no attempt to provide anything more than token support, and offered no justifiable excuse for his lack of support. *See id.* at 864. From the totality of the circumstances, we conclude that clear and convincing evidence supports the trial court's finding of abandonment by willful failure to support.

## 2. Mental Incompetence (Mother)

The trial court terminated Mother's parental rights on the additional ground of mental incompetence pursuant to Tenn. Code Ann. § 36-1-113(g)(8)(B).[16] That statute provides that

---

[15](...continued)

| | | | |
|---|---|---|---|
| 03/16/2009 | $9.23 | Total: | $57.67 |
| 04/01/2009 | $9.23 | | |
| | Total: $94.59 | | |

[16]Tenn. Code Ann. § 36-1-113(g)(8)(B) provides that:

> The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:
>
> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future, and
>
> (ii) That termination of parental or guardian rights is in the best interest of the child;

(continued...)

parental rights may be terminated if the court finds, by clear and convincing evidence, that "the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future."[17] Tenn. Code Ann. § 36-1-113(g)(8)(B). Under the statute, a parent's actions regarding their inability to care for a child due to a mental disability do not have to be willful before such actions can form a basis for terminating that parent's parental rights. Tenn. Code Ann. § 36-1-113(g)(8)(C) (2003); *State v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990).

In its termination order, the lower court noted extensive evidence of Mother's impaired mental condition:

> Dr. Elizabeth Ladd, testifying as an expert, outlined three areas of concern of [Mother's] ability to adequately parent the children. The first was mental health and cognitive impairments that might limit her ability to provide effective parenting; the second is adequate parenting skills; the third concern is the lack of an adequate family support. [Mother] has a special education high school diploma; draws SSI for mental disability; scored in the very low to borderline range of intelligence; has not been able to hold a job; and, despite attending school for twelve years, has only attained a second grade reading ability, all apparently due to low intellectual functioning. Dr. Ladd opined that [Mother's] cognitive limitations could present a barrier to effective parenting; that the prognosis for needed changes in parenting ability in the future is poor.

> Dr. Ladd, having reviewed the services provided since the children were placed in DCS custody, and the lack of adequate progress in parenting skills development by [Mother] opined that she had reached the maximum benefit from these services

---

[16](...continued)

[17]The statute references "a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent . . . is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's . . . rights to the child." Tenn. Code Ann. § 36-1-113(g)(8)(A). The termination hearing conducted by the juvenile court in this case satisfies this requirement. *In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899 (Tenn. Ct. App. Nov.18, 2002).

. . . and that not much benefit will be gained from further services.

On appeal, Mother raises an issue concerning the admissibility of the testimony of Dr. Ladd as well as the Compass Care parenting skills assessment on which Dr. Ladd based her testimony.[18] Mother (and Father) moved to strike this evidence at trial based on the fact that the assessors who performed the evaluation did not testify.[19] However, while Mother raises the issue in her brief, she does not argue the issue in the body of her brief, nor does she provide any legal authority for her assertion. Consequently, we find this issue to be waived. Mother has failed to comply with Tenn. R. App. P. 27(a)(7), which requires all arguments in an appellant's brief to "set[] forth the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities and appropriate references to the record." *See also* Rule 6, Rules of the Court of Appeals of Tennessee. A party "must thoroughly brief the issues they expect the appellate courts to consider." **Waters v. Farr**, 291 S.W.3d 873, 919 (Tenn. 2009) (citing **State ex rel. D'Amore v. Melton**, 186 Tenn. 548, 550, 212 S.W.2d 375, 376 (1948)). "This principle enables judges to be 'more confident in the results of their deliberations' because 'they have heard the issues argued by attorneys that are duty-bound to fully develop their opposing positions.'" **Waters**, 291 S.W.3d at 919 (quoting **State v. Northern**, 262 S.W.3d 741, 766 (Tenn. 2008) (Holder, J., concurring and dissenting)). Where, as here, the appellant has failed to make any argument addressing the issues raised, and has provided no authority supporting her allegations, that issue is waived on appeal. **Bean v. Bean**, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000); **Blair v. Badenhope**, 940 S.W.2d 575, 576-77 (Tenn. Ct. App. 1996).

The evidence in the record bears out the trial court's determination that Mother was incompetent to care for her children. The psychological evaluation performed by Frontier

---

[18] Mother's issue, as stated verbatim in her brief, is as follows:

> Did the trial court commit reversible error by denying the trial motion of Mother (and Father's) counsel, to dismiss the State's *Petition to Terminate Parental Rights* when, at the conclusion of State's proof, the State had not produced, in support of their expert's testimony, two witnesses, referred to as "assessors," Kelle Ratliff and David Konstanopolus, who had actually prepared the Parenting Skills Assessment (of both Mother and Father) respectively, which the State's expert psychologist merely adopted, and testified, but only upon assurances of the State to the Respondents these two (2) individuals would appear for cross examination.

Brief of Appellant at 6.

[19] Father did not raise this issue on appeal.

Health in January 2008 indicated Mother was within the borderline range of intelligence; the parenting skills assessment performed by Compass Care in October 2008 indicated a "very low range score."[20] Compass Care's assessment further indicated that Mother had deficits in both her parenting skills and in her ability to provide a safe and nurturing environment for the children, and that Mother did not seem aware of hygienic standards. Ms. Bowman, the HUGS nurse who worked with the family on parenting skills and caring for the children from March 2006 until the children were removed in October 2007, testified that there was a lack of intellectual ability on the part of Mother to comprehend and follow through with Ms. Bowman's instructions. Ms. Webb, the Compass Care employee who taught Mother parenting skills and was present during therapeutic visitations, testified that she had concerns for the children's safety during visitations because Mother "had difficulty dividing her attention three ways to be able to supervise the children consistently." Ms. Webb did not believe that in the near future Mother would progress to be able to safely supervise the children. Likewise, the DCS case manager, Ms. Shepard, testified that she was unable to leave the children unattended with Mother during visitations due to safety concerns.

The evidence at trial was overwhelming that Mother is mentally incompetent to parent her children. Furthermore, in spite of the resources DCS offered to teach Mother parenting skills, she demonstrated little improvement indicating that she could resume the safe supervision of the children. From the totality of the circumstances, we conclude that there is clear and convincing evidence that Mother's current mental disability, and ongoing prognosis, render her unable to adequately provide for the care and supervision of these children. Consequently, we affirm the trial court's finding.

We next turn to grounds for termination that the trial court found applicable to both parents: (1) abandonment by failure to provide a suitable home and (2) persistence of the conditions that led to the children's removal.

### 3. *Abandonment by failure to provide a suitable home (Mother and Father)*

The trial court found that DCS proved, by clear and convincing evidence, that pursuant to Tenn. Code Ann. § 36-1-113(g)(1), Mother and Father had abandoned the children, as defined in Tenn. Code Ann. § 36-1-102(1)(A)(ii), by failing to provide a suitable

---

[20]In the evaluation performed by Frontier Health in January, 2008, Mother obtained a full scale IQ of 77 which placed her in the 6th percentile. Dr. Ladd testified that the 6th percentile corresponded with the 6th lowest score out of one hundred people arrayed based on intellectual ability. According to Dr. Ladd, Mother scored "considerably better" on the January 2008 evaluation than on the one performed by Compass Care in October 2008.

-13-

home.[21]  The court noted that at the time of removal of the two oldest children on October 26, 2007, the home "was in a state of disrepair, extremely cluttered, with animal feces on the floors and no running water."  The court found that the next home the parents located was "also in a state of disrepair, with broken glass, holes in the floor large enough for the children to fall through, dangling and exposed electrical fixtures and no heating unit."  Even though DCS offered rent and deposit assistance on a suitable residence, and informed the parents that this prospective home was not a suitable residence, the parents nevertheless refused assistance and moved into the home in November, 2007.  At the time the youngest child was removed from the parents following her birth on April 15, 2008, (which was nearly six months after the older children were removed), the court found that the parents had still not obtained suitable housing stating, "[t]he lack of reasonable efforts to obtain a suitable home for the children demonstrates such a lack of concern that it appears that they will not be able

---

[21]Tenn. Code Ann. § 36-1-113(g)(1) provides for termination of parental rights if "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred.

Tenn. Code Ann. § 36-1-102(1)(A)(ii) provides that:

> (A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> . . . .
>
> (ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department.

to provide a suitable home for the children at an early date."

We have reviewed the record and agree with the trial court's determination that Mother and Father abandoned the children by failing to provide a suitable home. Photographs taken of the home at the time of removal, as well as the testimony of Ms. Shepard and the parents themselves, amply support the court's conclusion as to the state of the home at the time of removal of the two oldest children. Ms. Shepard testified to the continuing problems the parents faced finding appropriate housing. Including the home the children were removed from, the parents lived in at least four different places in the span of sixteen months, and the evidence supports the trial court's conclusion that, until January or February of 2009, neither parent had obtained a residence that was physically suitable for the children.

Under Tenn. Code Ann. § 36-1-102(1)(A)(ii), we are to analyze the four month periods following the removal of each child into state custody to determine the reasonableness of efforts made by DCS and the parents toward establishing a suitable home.[22] After reviewing the record, we conclude that in the four months following the oldest children's removal, DCS made reasonable efforts to help the parents obtain suitable housing, including offering advice and assistance in selecting a suitable home, offering rent and deposit assistance, and providing heaters during wintertime.[23] The parents largely ignored or refused to accept this assistance and obtained housing that was not suitable for the children's return. Likewise, in the four months following the birth of the youngest child, during which time the parents had still not obtained suitable housing, DCS continued to provide advice and assistance to the parents regarding suitable housing. DCS also provided in-home services to teach the parents basic hygiene and housekeeping, yet the evidence indicates that Mother and Father struggled to apply these fundamental homemaking skills. While Mother eventually obtained a residence that was physically appropriate for the children, the trial court found that the approximately eighteen month delay, coupled with the Mother's demonstrated inability to parent, rendered it an unsuitable home. A suitable home requires more than a proper physical location. *State Dept. of Children's Services v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. 2007). Neither parent demonstrated the effort or ability to provide, at a bare minimum, a home that was safe, clean, and nurturing to these children. We conclude that the evidence contained in the record supports the trial court's finding, by a clear and convincing standard, that Mother and Father

---

[22]The relevant time periods here are 10/26/2007 to 2/26/2008 for the two oldest children, and approximately 4/17/2008 to 8/17/2008 for the youngest child.

[23]Further discussion of the efforts made by DCS towards reunification of the family are detailed *infra*.

-15-

abandoned their children by failing to provide a suitable home.

### 4. Persistence of Conditions (Mother and Father)

Tenn. Code Ann. § 36-1-113(g)(3) provides for termination of parental rights when the conditions that led to the children's removal persist unremedied.[24] The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. and M.S.*, No.1999-01286-COA-R3-CV, 2000 WL 964775, at *6 (Tenn. Ct. App. July 13, 2000) (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S.*, 2000 WL 964775, at *7). "Where, as here, efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *In re T.S.*, 2000 WL 964775, at *7. The purpose behind the "persistence of conditions" ground for terminating parental

---

[24]Tenn. Code Ann. § 36-1-113(g)(3) provides:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

In *In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005), this Court held that, "based on the statutory text and its historical development, Tenn. Code Ann. § 36-1-113(g)(3) [grounds of persistence of conditions] applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." As noted above, all three children were adjudicated dependent and neglected on stipulation of the parties on July 16, 2008.

rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, 2008 WL 4613576 at *20 (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

The two oldest children were removed based on environmental neglect. The trial court found that "from October, 2007 until January or February of 2009, neither parent had obtained a residence that was physically suitable for the return of the children." Furthermore, the court found that "[i]n the twenty-two months since the removal, other conditions have occurred or come to light which in all likelihood would result in the children being subjected to further abuse or neglect and prevent the children's safe return to the home of their parents." These "other conditions" were the mental condition of Mother, which the court found "will prevent her from effectively parenting the children," and the unchallenged no contact order between Father and the children based on allegations of sexual abuse.

Regarding Mother, the court stated:

> Despite extensive assistance and training thought [sic] various DCS providers, [Mother's] ability to parent the children has not improved significantly since the children have come into custody. The various assessments which were done showed that [Mother] has a limited cognitive ability, and that it is so limited that the ability to parent three children and manage a household is beyond her capability. While there was testimony that she would be able to cope if she had daily assistance, there was also testimony that her family would not provide such assistance, either long term or short term. There is no doubt that [Mother] loves her children. Unfortunately, she does not have the ability to adequately parent the children without significant assistance, and that assistance is simply not available to her.
> . . . .
>
> It is evident that the mother's ability to parent the children is not going to change in the near future. There has been no improvement despite significant assistance and training.

Regarding Father, the court stated:

> [Father] is currently under a No Contact Order for his children. This Court issued the Order on allegations that he had

-17-

sexually abused his oldest daughter, and appeared to become sexually aroused while holding his infant daughter. The No Contact Order had been in effect for approximately a year at the time of the last hearing in this matter. [Father] has not made any challenge to the No Contact Order in the underlying case, nor has he presented any evidence in this matter to show that it would be safe for the children to be in his custody. The unchallenged No Contact Order prevents any possibility of an early integration into any home where he resides, now or in the near future.[25] Notwithstanding the foregoing, [Father] at present appears to be unemployed, living in the home of relatives and is completely unable to provide a home for the children. The conditions at the time of the removal were essentially the same, as he was either unemployed or significantly under employed given his education and had the children living in some of the worst environmental conditions this Court has seen to date. . . . .

The father has not even attempted to remedy his situation of unemployment/under-employment or address the issues that led to the No Contact Order.

After reviewing the entire record, we conclude that the evidence supports the trial court's finding, by a clear and convincing standard, that the conditions which lead to the removal of these children still persist, that other conditions, which in all likelihood would result in the children being subjected to further abuse or neglect still persist, that there is little likelihood that these conditions will be remedied at an early date so that the children may be returned to Mother or Father, and that the continuation of the parent-child relationship diminishes the children's chances of early integration into a safe, stable, and permanent

---

[25] From the bench, the trial court noted that:

[T]he Court does not believe that the sexual abuse allegations that were made that occurred prior to the children entering care are substantiated. The Court . . . does not find that the allegations that he sexually abused these children prior to them coming into care . . . carry any weight. However, the Court is concerned about the testimony that was introduced about the visitation that occurred and the guardian ad litem observed and other witnesses in which [Father] was holding the child and he had an erection while holding the child and it causes the Court great concern given the fact that . . . occurred.

-18-

home.  Tenn. Code Ann. § 36-1-113(g)(3).

The evidence clearly shows that in the six months following the removal of the older children, and in the six months following the removal of the youngest child, the parents were unable to remedy the conditions that led to the children's removal.  Father continued to fluctuate between unemployment and underemployment and showed little willingness to provide financially for his children, as evidenced by his token  child support payments and his failure to obtain suitable housing.  In addition to the trial court's finding, we note that, despite receiving parenting training, Father never demonstrated adequate parenting skills, which would allow the safe return of his children.  Ms. Shepard testified that, during the nearly two years that she'd worked with them, neither parent's parenting skills had improved.  Multiple witnesses testified that Father often fell asleep during visitations, even while holding his newborn baby.  Father was provided ample opportunity to improve his situation and to remedy the conditions leading to the removal of the children.  However, Father failed to avail himself of these opportunities.

Likewise, the overwhelming evidence indicates that Mother showed little progress in her ability to parent her children.  The Compass Care parenting skills assessment dated November 7, 2008, stated that:

> [I]t does not appear that her parenting skills have increased since the children were brought into the state's custody on 10/26/2007.  It is the opinion of both Dr. Ladd and [the assessor] Mrs. Ratliff that the threshold of 'maximum benefit' has been reached and it is not anticipated that much benefit will be gained from further services.

Angela Webb, a Compass Care employee who provided therapeutic services and parenting skills education to Mother from February 2009 through the dates of the hearing, responded to questions from the State's attorney as follows:

> Q:  Okay.  Now do you think that any time in the near future she's going to be able to successfully safely supervise these children on her own?
> A:  I don't think so
> . . . .
> Q:  Why not?
> . . . .
> A:  I just feel that if she was able, she would have done it by now.  I mean, I feel like she's been a very cooperative client.

> She's listened and talked with me. She's never missed a
> meeting. I feel that she is trying and I think that she has done
> her best.
> Q: But you still have concerns with the children around her or
> her ability to keep the children safe?
> A: I do

We recognize that Mother eventually obtained stable housing and that she was consistent in her efforts to visit the children and to improve her situation. However, "[a] parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, 2008 WL 4613576, at *20 (citation omitted). Here, both the efforts of social agencies to assist Mother and Mother's own efforts to learn basic parenting skills that would allow her to safely care for these children have proved ineffective in achieving that goal. Moreover, given the circumstances, there is little likelihood of sufficient improvement so as to allow the safe return of these children. We conclude that DCS clearly and convincingly proved grounds for termination based on persistence of conditions as to both parents and, therefore, affirm the trial court's finding.

## V. Reasonable Efforts

Before the trial court can terminate parental rights, it must determine that DCS made reasonable efforts to assist the parent in remedying the conditions that led to the removal of the children. Tenn. Code Ann. § 37-1-166(a); *In re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 n. 27 (Tenn. Ct. App. March 9, 2004).[26] When DCS' obligation to make reasonable efforts is implicated, it must prove that it made those reasonable efforts by clear and convincing evidence. *In re R.L.F.*, 278 S.W.3d 305,

---

[26]Tenn. Code Ann. § 37-1-166 is applicable to parental termination cases. *See e.g. In re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *8 (Tenn. Ct. App. March 9, 2004); see also *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006). Section 36-1-113 is the statute which provides the grounds for termination of parental rights. Section 37-1-166 is the statute dealing with the efforts which must be made prior to a court entering orders committing or retaining a child within the custody of DCS. Both statutes address the obligations of DCS when separating children from their parents. By terminating parental rights, the court is committing the child to the custody of DCS. Because both statutes address the same subject, they should be construed together, *in pari materia*. *Frye v. Blue Ridge Neuroscience Ctr.*, 70 S.W.3d 710, 716 (Tenn. 2002). Therefore, the "reasonable efforts" required by section 37-1-166 are the same "reasonable efforts" required by section 36-1-113. For a more detailed discussion of this analysis, *see In re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *8 (Tenn. Ct. App. March 9, 2004).

316 (Tenn. Ct. App. 2008). This burden requires that DCS present sufficient evidence to enable us to conclude, without serious or substantial doubt, that its efforts were reasonable under the circumstances.[27] *Id*.

The term "reasonable efforts" is statutorily defined as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). To determine whether reasonable efforts have been made, the trial court should consider:

 1. The reasons for separating the parents from their children,
 2. The parents' physical and mental abilities,
 3. The resources available to the parents,
 4. The parents' efforts to remedy the conditions that required removal of the children,
 5. The resources available to the Department,
 6. The duration and extent of the parents' efforts to address the problems that caused the children's removal, and

---

[27]The procedure for establishing reasonable efforts is set forth in Tenn. Code Ann. § 37-1-166(c). Pursuant to this statute, DCS must file an affidavit with the court to enable it to determine whether reasonable efforts have been made. This affidavit must detail (1) whether removal of the child is necessary to protect the child, and if so, what are the risks which necessitate removal; (2) identify the specific services necessary to reunite the family; (3) detail which services have been provided; and (4) state whether DCS has had the opportunity to provide services to the family and if not, explain why the services have not been provided. Tenn. Code Ann. § 37-1-166(c)(1)-(4).

An affidavit which meets the requirements of Tenn. Code Ann. § 37-1-166(c) is sufficient to establish the reasonableness of DCS' efforts by clear and convincing evidence. *In re Giorgianna H*., 205 S.W.3d 508, 518 n. 22 (Tenn. Ct. App. 2006); *see also In re C.M.M.*, 2004 WL 438326, at *8. "Thus, unless a parent asserts that [DCS'] efforts were not reasonable, [DCS] is not required to present additional evidence regarding its remedial efforts." *In re C.M.M.*, 2004 WL 438326, at *8. If a parent disputes the reasonableness of DCS' efforts, DCS may be required to present additional proof regarding its efforts. *Id*.

Failure to comply with this statutory requirement is not fatal as long as DCS presents sufficient, specific evidence to establish the reasonableness of its efforts. *Id.*; *see also In re R.L.F.*, 278 S.W.3d 305, 316 (Tenn. Ct. App. 2008) (proceeding with review to determine the reasonableness of DCS' efforts despite the finding that DCS did not file the statutorily required affidavit). In this case, the record does not contain affidavits of reasonable efforts for the two oldest children. The record does contain an affidavit of reasonable efforts for the youngest child; however, it is unclear whether this affidavit was ratified by the juvenile court. Therefore, in an abundance of caution, we will review the entire record to determine if DCS presented sufficient evidence to establish the reasonableness of its efforts.

7. The closeness of the fit between the conditions that led to the removal of the children, the requirements of the permanency plan, and [DCS'] efforts.

*In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006).

"The success of a parent's remedial efforts generally depends on [DCS'] assistance and support." *In re Giorgianna H.*, 205 S.W.3d at 518. "Accordingly, the [DCS] employees have an affirmative duty to utilize their education and training to assist parents in a reasonable way to address the conditions that led to the child's removal . . . ." *In re R.L.F.*, 278 S.W.3d at 316. The duty to exert reasonable efforts exists whether the parent asks for assistance or not. *Id*. The efforts made need not be "herculean," but DCS must do more than simply provide the parents with a list of services. *In re Giorgianna H.*, 205 S.W.3d at 518 (citing *In re C.M.M.*, 2004 WL 438326, at *7). However, the duty to make reasonable efforts is not a one-way street. Parents share the responsibility of addressing the conditions as well. "Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required [DCS] to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d. at 519.

In this case, the trial court found that DCS had "made reasonable efforts above and beyond the call in providing services for this family." Having reviewed the record we agree that DCS carried its burden under the circumstances. In the four months following removal of the two oldest children, Ms. Shepard testified that she scheduled mental health and marriage counseling[28]; gave the parents information necessary to acquire a land line telephone and mailed in the application for them; referred them to parenting classes; provided transportation; offered to pay rent on a suitable home and visited a prospective residence to determine its suitability; purchased heaters for the home; encouraged Father to get a job and referred him to Vocational Rehabilitation; and set up Options to provide in-home services. The parties also underwent psychological evaluations in January 2009. In March 2008, Options began conducting therapeutic visitations and working with Mother and Father on parenting skills, homemaking, personal hygiene, and budgeting skills. These services were aimed towards teaching the parents the skills necessary to safely reunite them with their children. Options continued to provide services in the four months following the birth of the youngest child. Later, Compass Care replaced Options and provided services through the termination hearing. Responding to questions from the court, Ms. Shepard averred that DCS had used all available resources to assist the family.

---

[28]Mother testified that she went to marriage counseling "once or twice."

While there were some delays and disruptions with in-home services provided by DCS (i.e., Options did not begin working with the family until March 2008, and there was a temporary disruption in the summer of 2008 due to lack of state funding), we cannot say that these issues negate the otherwise significant efforts of DCS to reunite this family. Before Options entered the picture, DCS provided the assistance listed above geared towards meeting Mother and Father's housing, employment, and mental health needs. Furthermore, DCS can only provide the resources that it has available to it, and a temporary disruption of a particular service does not invalidate all of DCS' efforts.

Mother essentially objects to the quality of these efforts. Mother finds fault with the fact that she received "hands-on" parenting training without the children present. Mother also argues that it was difficult to demonstrate the parenting skills she had learned because her only contact with the children took place in a small room at DCS while DCS employees and contract providers monitored her parenting. Mother argues that these circumstances prevented her from learning and applying the parenting skills that she had been taught. While we understand Mother's argument, we do not agree that these circumstances negate the reasonable efforts of DCS. The testimony of Ms. Webb indicates that she was aware of Mother's limitations and, after seeking the advice of other social workers, tailored the parenting classes to accommodate Mother's learning style. Furthermore, the decision to hold visitations at DCS, the park, or McDonald's, rather than Mother's home, which decision was reached after consultation with the guardian ad litem, was based on legitimate concerns. For some time following removal of the children, Mother did not have a suitable home in which to conduct visitations. Once she had acquired a suitable home, Ms. Shepard and the guardian ad litem believed that holding visitations in a place the children were familiar with was a preferable environment to Mother's home where the children had never been. Mother's objections as to how assistance was provided does not negate the reasonable efforts made under the circumstances by DCS.

Father argues that he received inadequate services and did not receive any services following the issuance of the no contact order. We find this argument untenable. Father received the assistance noted above geared towards helping him find a job, providing suitable housing for his family, and learning necessary parenting skills. While DCS concedes that services stopped following the no contact order in August 2008, this was some ten months after the oldest children's removal. Prior to that time, DCS had provided significant assistance. Furthermore, the record is full of instances of Father not following through with DCS' suggestions or offers of assistance. Reunification "is a two-way street, and neither law nor policy requires [DCS] to accomplish reunification on its own without the assistance of the parents." *In re Tiffany B.*, 228 S.W.3d 148, 159 (Tenn. Ct. App. 2007) (citations omitted). "Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody." *Id.* "They must also make reasonable efforts

to rehabilitate themselves once services have been made available to them." ***Id.*** It is the opinion of this Court that Father failed to make reasonable efforts of his own which would allow the return of his children and that DCS did all that was required under the circumstances.

## VI. <u>Best Interests</u>

Before a court in this State can terminate a biological parent's parental rights, it must find that doing so is in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination is in the child's best interest.[29] The trial court is

---

[29]Tenn. Code Ann. § 36-1-113(i) provides:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the

(continued...)

not limited to these factors. Tenn. Code Ann. § 36-1-113(i). Moreover, the best interests of a child must be determined from the child's perspective and not the parents. *White v. Moody,* 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (citations omitted).

The juvenile court found that termination of both Father's and Mother's parental rights was in the best interests of the children. In its termination order, the court specifically noted Father's non-payment of child support and lack of adjustment in circumstances despite the reasonable efforts of DCS as factors weighing in favor of termination[30] Regarding Mother, the court considered her lack of adjustment in circumstances despite the reasonable efforts of DCS, as well as her inability to safely nurture and care for the children due to her limited cognitive ability.[31] The guardian ad litem focused her closing argument exclusively on the best interests of the children and recommended termination. From the comments made from the bench, it is also clear that the court considered the parent's history of environmental neglect, Father's arrest for possession of marijuana, and the children's stable placement with foster parents who hope to adopt them as important factors weighing in favor of termination. We have reviewed the record and conclude that clear and convincing evidence was present to support the trial court's findings. Accordingly, we affirm the trial court's finding that termination of Mother's and Father's parental rights is in the best interest of the children.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's termination of both Mother's and Father's parental rights. Costs of this appeal are taxed one-half to Mother and one-half to

---

[29](...continued)
> parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

[30]*See* Tenn. Code Ann. § 36-1-113(i)(1), (2), and (9).

[31]*See* Tenn. Code Ann. § 36-1-113(i)(1), (2), and (8).

Father, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE